

Tagged Opinion

**ORDERED in the Southern District of Florida on January 16, 2009.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                          CASE NO. 07-21016-BKC-LMI

SUNDALE, LTD. and KENDALL HOTEL          Chapter 11
AND SUITES, LLC,                                 Jointly Administered

                Debtors.
_____/

### ORDER DENYING CREDITORS' MOTION TO
### <u>APPOINT A CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE AN EXAMINER</u>

This matter came before me on the Creditors' Joint Motion for the Appointment of a

Chapter 11 Trustee or in the Alternative an Examiner (DE #243) and Motion and Notice of

Joinder of Ocean Bank in Relief Sought (DE #287) (collectively the "Trustee Motion"). After a

trial conducted on May 27; June 3; October 27, 28, 29, and 30; and December 9 and 11, 2008,

having reviewed all the evidence, and having considered the arguments of counsel, and for the

reasons stated below, I deny the Trustee Motion.

## FACTS

These chapter 11 cases involves the jointly administered estates of two Debtors, Sundale, Ltd., and Kendall Hotel and Suites, LLC ("KHS"). Sundale filed for chapter 11 protection on December 12, 2007. KHS filed for chapter 11 protection on January 30, 2008. An order was entered on February 5, 2008, granting Debtors' motion for joint administration (DE #80).

Sundale is the owner of approximately nine acres of real property located in Miami-Dade County, Florida, which is bordered on the north side by S.W. 88th Street, on the east by S.W. 90th Avenue, and on the west by S.W. 92nd Avenue (the "Sundale Property"). Located on the Sundale Property are several buildings comprising a hotel (the "Hotel").

KHS leases the Hotel from Sundale pursuant to a lease dated February 28, 2007 (the "Hotel Lease").  KHS operates the Hotel as a Crowne Plaza pursuant to a license agreement dated December 28, 2006 (the "Crowne License Agreement") with Holiday Hospitality Franchising, Inc. ("Holiday Hospitality") which operation began in March 2007.

Ultimately, both Debtors are controlled by a single person, Phillip Scutieri. Sundale is a Florida limited partnership. Mr. Scutieri is the limited partner of Sundale, and the sole director and shareholder of Sundale's general partner, Kendale Capital Inc. KHS is a Florida limited liability company in which Mr. Scutieri owns all of the membership interests. Mr. Scutieri, as trustee, also owns 2.2 acres of real property adjacent to the Sundale Property (the "Trustee Property"). The tennis courts used by the Hotel are partially located on the Trustee Property.

Mr. Scutieri has owned the Sundale Property since the early 1970's.  The property was originally an adult congregate living facility ("ACLF").  Sometime in the mid-1990's Mr. Scutieri decided to convert the ACLF to a hotel.  Part of that construction was financed by various Scutieri entities and part was financed by an entity known as Florida Associates Capital

Enterprises, Inc. ("FACE").  At or around the time the reconstruction was complete, Ocean Bank provided financing, a portion of which was used to pay down the FACE debt.

Originally the Hotel was operated as a Radisson by an entity known as Kendall Resort Hotel, Ltd. ("KRH, Ltd."), a Florida limited partnership.  Sometime in 1998, Sundale and KRH, Ltd., entered into a lease for the Sundale Property and the Hotel for a term of 20 years with rent being the greater of $1,400,000 per year, or 60 percent of the total rental receipts less certain allowances (the "KRH, Ltd. Lease"). On or about April 24, 1998, KRH, Ltd. and Radisson Hotels International, Inc. ("Radisson") entered into a License Agreement (the "Radisson License Agreement"), which, *inter alia*, permitted KRH, Ltd. to operate the Hotel as a "Radisson" subject to the terms and conditions set forth therein. The Hotel began operating as a Radisson in April 2003.

On June 22, 2006, KRH, Ltd. filed a complaint against Radisson in Miami-Dade County Circuit Court alleging breach of the Radisson License Agreement (the "Radisson Complaint"), which litigation was subsequently removed to Federal District Court (the "Radisson Litigation"). At the time of the Radisson Litigation, Mr. Scutieri managed KRH, Ltd., although there is a dispute whether Mr. Scutieri actually had any direct or indirect ownership interest in KRH, Ltd. At the time the Radisson Litigation began, the Radisson License Agreement was terminated and the Radisson flag removed. The Hotel operated for approximately eight months unflagged between the time the Radisson flag was removed and the Hotel became a Crowne Plaza.

KHS was formed on June 26, 2006, and operations of the Hotel were transferred from KRH, Ltd. to KHS at the time the Crowne License Agreement was signed.

KRH, Ltd., and its managing member, Grand Main Holdings, Inc., each filed voluntary chapter 7 bankruptcy petitions on May 22, 2007. The petitions were signed by Mr. Scutieri's attorney, Richard O'Brien, as an officer or manager of each entity.

As part of the Crowne License Agreement, KHS agreed to complete a Property Improvement Plan (the "PIP") for the Hotel. The PIP consisted of a number of required improvements, including installation of sprinklers in all hotel rooms. On October 2, 2007, Holiday delivered to KHS a notice of default and termination for failure to complete the work required in the PIP.  After failed attempts to resolve the PIP issue, Holiday issued a termination letter on February 1, 2008.  However, KHS had already filed its voluntary chapter 11 petition on January 30, 2008.  The Hotel is currently still operating with a Crowne Plaza flag, but as detailed below that flag may be removed after February 5, 2009.

Prior to and during these bankruptcy cases, Sundale has been involved in ongoing disputes with three of its creditors, FACE, Ocean Bank and a group of entities known as the Codina Parties.[1] FACE contends that it has a secured claim against Sundale based on promissory notes executed by Sundale on September 7, 2001, which notes are secured by a second mortgage lien on both the Sundale Property and on the Trustee Property. FACE has filed a proof of claim in the amount of $4,712,633.20, and asserts interest is accruing at a per diem rate of $1,602.74, or approximately $48,000 per month. FACE has also filed an unsecured proof of claim against KHS in the amount of $3,875,187.50. The Debtors dispute that FACE is a legitimate creditor in either bankruptcy case and disputes that any money is owed to FACE. The Debtors contend the money provided by FACE was not a loan but rather was money given to Mr. Scutieri to settle a long-standing dispute between Mr. Scutieri and Raymond Chambers, whose personal funds,

---

[1] The Codina Parties are comprised of Armando Codina; Codina Group, Inc.; C/CSMB Associates, Ltd.; CSMB Associates, Ltd.; and CSMB GP, Inc.

4

directly or indirectly, financed the FACE loan.  FACE and the Debtors are involved in two adversary proceedings, one brought by the Debtor to enjoin FACE's attempt to foreclose on the Trustee Property,[2] and the other brought by FACE seeking a declaratory judgment as to the extent, validity, and priority of FACE's lien (the "FACE Dec Action").[3]

CSMB Condominium, LLC is the owner of approximately eight acres of real property located in Miami-Dade County, Florida immediately south of the Trustee Property (the "CSMB Property"). The managing member of CSMB Condominium, LLC is CSMB Associates, Ltd. CSMB Associates, Ltd consists of partners, CSMB GP, Inc, a Florida corporation, and 0.1% general partner, C/CSMB Associates, Ltd, a Florida partnership, a 55.9% limited partner and Resorts Financial, Inc ("RFI"), a 44% limited partner.  RFI is owned by Mr. Scutieri.  Pursuant to a joint venture agreement RFI contributed or sold certain property to the venture so that the CSMB Property, the Trustee Property, and Sundale Property could be jointly developed. Disputes arose among the parties and Mr. Scutieri, RFI and Sundale filed suit against the Codina Parties in Miami-Dade County Circuit Court (the "Codina Litigation").  The Codina Parties filed a counterclaim in the Codina Litigation and sought authority from the state court to sell the CSMB Property.  The Codina Parties have filed a proof of claim against Sundale in an unliquidated amount based on the Codina Litigation. The Debtors dispute that the Codina Parties are legitimate creditors in these cases.

Ocean Bank has filed a secured proof of claim in the amount of $11,850,594.37 based on a promissory note and mortgage executed by Sundale and KHS' predecessor in interest, KRH, Ltd., on September 7, 2001 (the "Ocean Bank Loan"). The Ocean Bank Loan is secured by what Ocean Bank asserts is a first priority lien on the Sundale Property and the Trustee Property.

---

[2] Adv. Case No. 08-01552-BKC-LMI.
[3] Adv. Case No. 08-01312-BKC-LMI.

Ocean Bank claims its loan is accruing interest at a per diem rate of $7,322.54, or approximately $220,000 per month. Ocean Bank also claims its loan matured pre-petition. Sundale asserts that Ocean Bank wrongfully reneged on an agreement to extend the maturity date of the Ocean Bank Loan. The Ocean Bank Loan is currently over secured.

The bankruptcy cases have been contentious from the beginning.  In the first month of the case, FACE filed a motion seeking determination that the Sundale case is a single asset real estate case (DE #57), which motion was vigorously opposed by the Debtors. I ultimately ruled that Sundale was a single asset real estate case but granted the Debtors' motion to extend the deadlines imposed by 11 U.S.C. §362(c)(3). Almost at the same time the Codina Parties filed a motion for relief from stay seeking authority to continue the Codina Litigation (DE #70), which motion was opposed by Sundale. I granted that motion.

In month two, the Debtors filed a motion to disqualify FACE's counsel (DE #90), which motion required an evidentiary hearing. I ultimately denied that motion. The following month, Holiday Hospitality filed a motion to compel KHS to pay franchise fees pending assumption or rejection of the Crowne License Agreement (DE #202), which fees KHS had not paid since the KHS petition date. KHS opposed the Holiday Hospitality motion to compel arguing, *inter alia*, defaults by Holiday Hospitality under the Crowne License Agreement, including failure to provide bargained for services under the Crowne Plaza reservation system.  Holiday Hospitality also sought stay relief to terminate the Crowne License Agreement due to KHS' alleged failure to install and provide sprinklers in all commercial areas of the Hotel, and complete other PIP items (DE #295). I ordered KHS to begin paying franchise fees while setting the stay relief motion for evidentiary hearing.

Meanwhile the parties learned KHS was not paying Sundale rent.  The Debtors argued that, while there was currently a build up of cash, KHS would need the cash to cover Hotel operating expenses during the slow summer months. Unpersuaded, I ordered KHS to start making rent payments to Sundale.

On April 25, 2008, FACE and the Codina Parties filed the Trustee Motion.  Ocean Bank promptly filed its joinder. While the movants sought an immediate trial, the Debtors objected, arguing that they needed additional time to prepare. Meanwhile FACE filed the FACE Dec Action and the parties were before me on a regular basis on discovery disputes.

During the course of one of the many proceedings before me, the movants suggested the lack of sprinklers in the hotel rooms was a life safety issue – that is "people could die." Further, I learned that not only was KHS operating without its own liquor license, having failed to apply for one when it took over Hotel operations, but, apparently, KHS had been using the KRH, Ltd. liquor license and had renewed that liquor license without the knowledge or consent of the KRH, Ltd. Chapter 7 Trustee. Apparently, KHS had used the online "identity" of KRH, Ltd. for the renewal. On May 2, 2008, Drew Dilworth, as Chapter 7 Trustee for the estate of KRH, Ltd., filed a complaint against KHS seeking injunctive relief and damages on account of KHS' continued use of the  KRH, Ltd. Liquor License.[4]  Following a hearing on May 12, 2008, I entered an Order granting the Motion of the KRH, Ltd. Trustee for a temporary restraining order, and enjoined the Debtors from selling liquor at the Hotel.[5] No restriction was put on gifting liquor, so long as that did not violate state law.

---

[4] Adv. No. 08-1313-BKC-LMI, DE #1
[5] As of December 11, 2008, KHS did not have a license to sell alcoholic beverages at the Hotel. The Miami Dade Fire Department has refused to approve the installation of emergency lights at the Hotel and consequently has refused to sign off on KHS' liquor license application.

I determined it was necessary to have an immediate hearing on the life safety issue[6] and the circumstances surrounding the beverage license renewal. Accordingly, I bifurcated the trustee trial – setting the sprinkler issue and the beverage license issue for trial in June. To the extent resolution of the sprinkler and beverage license issue did not result in immediate appointment of a trustee, the balance of the trustee trial was scheduled for late July. At the conclusion of the June trial, I found no imminent harm to hotel guests from the lack of room sprinklers. I also found that the Debtor's explanation regarding the circumstances surrounding the beverage license renewal did not, in a vacuum, warrant appointment of a trustee. The second phase of the trustee trial was scheduled for July, but at the request of FACE was continued to September, and then, at the request of all parties, continued to late October. The parties failed to finish presentation of evidence by the fourth day of trial and so the final two days of the trial were set for early December. The presentation of evidence was finally concluded on December 11, 2008.

Meanwhile the trial on Holiday Hospitality's motion for stay relief was continued several times at the request of the parties. The parties ultimately settled and on November 17, 2008, I approved an agreement whereby Holiday Hospitality has the right to terminate its franchise agreement at any time on or after February 5, 2009.

Finally, I ordered the Debtors to file a chapter 11 plan or plans no later than 30 days after resolution of the Holiday Hospitality dispute. On December 5, 2008, KHS and Sundale filed a Joint Plan of Reorganization (DE #817) (the "Joint Plan") and proposed Disclosure Statement

---

[6] "I just want to hear from someone to give me some comfort from a [ ] neutral third-party as to issues regarding whether that is a safe situation or not because I don't think that anybody would dispute the fact that if there is a fire at a [Crowne] Plaza and people die that that will be a problem for [Crowne] Plaza. … So, you know, you all can use your judgment, but I, as judge, want to hear on May 27th, are people going to die." Trans., hearing on Joint Motion to Appoint Trustee, 64:19-65:2, 75:17-20 (May 12, 2008).

(DE #816). The Disclosure Statement hearing was held in early January and confirmation is set

for late February.

## GROUNDS FOR APPOINTMENT OF TRUSTEE

The Bankruptcy Code sets forth two avenues for appointment of a Chapter 11 trustee –

one mandatory and one discretionary. 11 U.S.C. §1104 provides the grounds for appointing a

trustee are:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor

There is a strong presumption in chapter 11 cases that a debtor in possession should

remain in possession absent a showing of the need for a trustee. *In re Suncruz Casinos, LLC*, 298

B.R. 821, 828 (Bankr. S.D. Fla. 2003); *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga.

2000). This presumption is based on the belief that the debtor in possession is most

knowledgeable about, and best able to run, the debtor's business. *Id.* Because the appointment of

a trustee is such an extraordinary remedy, the moving party must show that cause for

appointment of a trustee exists by clear and convincing evidence. *Official Comm. of Asbestos*

*Claimants v. G-I Holdings, Inc.* (*In re G-I Holdings, Inc.*), 385 F.3d 313 (3d Cir. 2004); *In re*

*Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Suncruz Casinos, LLC*, 298 B.R. 821; *In*

*re Intercat, Inc.*, 247 B.R. at 922; *In re Royster Co.*, 145 B.R. 88, 90 (Bankr. M.D. Fla. 1992); *In re Tyler*, 18 B.R. 574 (Bankr. S.D. Fla. 1982).[7]

The decision whether to appoint a trustee is fact intensive and the determination must be made on a case by case basis. *In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Bellevue Place Assoc.*, 171 B.R. 615, 622 (Bank. N.D. Ill. 1994). While any one issue may not warrant appointment of a trustee, the court may consider the cumulative or collective impact of the alleged problems or issues in making its decision. *In re Cardinal Indus., Inc.*, 109 B.R. 755 (Bankr. S.D. Ohio 1990). That is, the court must determine whether the totality of the circumstances warrant appointment of a trustee. *In re Sharon Steel Corp.*, 871 F.2d at 1228.

Under section 1104(a)(1) the court is required to appoint a trustee upon finding cause, including fraud, dishonesty, incompetence or gross mismanagement by the debtor. *In re Suncruz*, 298 B.R. at 828. The use of the word "shall" leaves no discretion in appointment once cause is found. In making a determination of whether cause exists under this section, courts have looked at a variety of factors including:

(1) Materiality of the misconduct;
(2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors or customers;
(3) The existence of pre-petition voidable preferences or fraudulent transfers;
(4) Unwillingness or inability of management to pursue estate causes of action;
(5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;
(6) Self-dealings by management or waste or squandering of corporate assets.

---

[7] Although the vast majority of courts, including the only circuit court to address this issue, has held that the standard of proof to appoint a trustee is clear and convincing evidence, one district court has held the standard for appointment should be preponderance of the evidence. *Tradex Corp. v. Morse*, 339 B.R. 823, 829 (D. Mass. 2006). While the movants urge application of the preponderance of the evidence standard, I choose instead to follow the only circuit direction on this issue. *See U.S. Tr. v. Pettibone Corp.*, 251 B.R. 335, 341 (N.D. Ill. 2000) ("While this court is not bound by th[e] precedent [of another circuit], this court should follow a holding from another circuit court of appeals unless it is convinced that court's decision is erroneous."). *Cf. Owens v. Miller* (*In re Miller*), 276 F.3d 424, 429 (8th Cir. 2002) ("a sister circuit's reasoned decision deserves great weight and precedential value").

*In re Intercat, Inc.*, 247 B.R. at 921. However, the level of the acts constituting cause, the

conduct, failure to act, or gross mismanagement, or the like, must "[rise] to a level sufficient to

warrant the appointment of a trustee." *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*,

828 F.2d 239, 242 (4th Cir. 1987) (quoting *In re General Oil Distributors, Inc.*, 42 B.R. 402

(Bankr. E.D.N.Y. 1984)). While appointment is mandatory once cause is found, it is within the

court's discretion, on a case-by-case basis, "to determine whether conduct rises to the level of

'cause.'" *Id.* at 242. *Accord In re Ford*, 36 B.R. 501, 504 (Bankr. W.D. Ky 1983); *In re Intercat,*

*Inc.*, 247 B.R. 911.

When determining the appropriateness of a trustee under section 1104(a)(2), that is,

whether the appointment of a trustee "is in the interest of creditors, any equity security holders,

and other interests of the estate" the court's exercise of its discretion is much broader and takes

into consideration a variety of different factors.

> §1104(a)(2) may well entail [ ] the exercise of a spectrum of discretionary
> powers and equitable considerations, including a cost-benefit analysis, to
> determine whether the appointment of a reorganization trustee would be in the
> interests of creditors, equity security holders and other interests of the Estate.

*In re Suncruz Casinos, LLC*, 298 B.R. at 829 (quoting *In re V. Savino Oil & Heating Co.*,

99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989)). *See In re Eichorn*, 5 B.R. 755, 758 (Bankr.

D. Mass. 1980).

"Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may

appoint a trustee even if no 'cause' exists." *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 428

(Bankr. S.D.N.Y. 2007). Instead, section 1104(a)(2) reflects the practical reality that a trustee is

needed. *Id. See also*, *In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re V. Savino Oil & Heating*

*Co.*, 99 B.R. at 527, fn. 11.

Factors that courts have used to determine whether a trustee should be appointed under this subsection include:

(1) the trustworthiness of the debtor;
(2) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;
(3) the confidence – or lack thereof – of the business community and of creditors in present management; and
(4) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment

*In re Euro-Am. Lodging Corp.*, 365 B.R. at 427 (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)).

## SUMMARY OF DISPUTE

The movants allege that appointment of a trustee is mandated by section 1104(a)(1) and appropriate in accordance with section 1104(a)(2). The movants argue that the manner in which Mr. Scutieri has operated the Hotel and handled the finances of both Debtors is at best, incompetence, and at worst, gross mismanagement, if not fraudulent. The movants cite, among other grounds, Mr. Scutieri's apparent total disregard prepetition for corporate formalities amongst the various entities he controls, including the Debtors; Mr. Scutieri's failure to pay real estate and personal property taxes; Mr. Scutieri's failure to transfer the liquor license such that the Hotel currently operates without a liquor license (and consequently cannot sell alcohol); that, in fact, the Hotel maybe illegally selling liquor; the Hotel's abysmal profit record; and the imminent loss of the Crowne Plaza flag.  The movants also cite as cause Mr. Scutieri's apparent conflict of interest in marketing the Sundale Property with the Trustee Property, Mr. Scutieri's decision to cease rental and franchise payments until I ordered Debtors to do so, the failure of either Debtor to propose reorganization plans after almost a year in bankruptcy, and the

inaccuracy of the Debtors' schedules. Finally, the movants argue that their total lack of confidence in Debtors' management, i.e. Mr. Scutieri, warrants appointment of a trustee.

Debtors respond that Mr. Scutieri has never stolen money from the Debtors, and, indeed, has put millions of dollars into the Hotel during its development and operation. The Debtors argue that the non-payment of taxes does not constitute "cause" because lots of chapter 11 debtors have tax issues and those issues can be resolved through the Joint Plan. Moreover, the Debtors argue, any alleged mismanagement by Mr. Scutieri has not caused any harm to the creditors and therefore any alleged "wrongdoings" are merely victimless crimes. Finally, Debtors argue that what motivated the Trustee Motion is really nothing more than one over-secured creditor (Ocean Bank) trying to cash out as soon as possible, whatever the consequences to other creditors; an alleged creditor (FACE) trying to replace Mr. Scutieri with someone who will settle their dispute; and a third-party non-creditor (the Codina Parties) who has filed a claim for the sole purpose of gaining leverage in the Codina State Court Litigation.

## CREDITORS HAVE NOT DEMONSTRATED CAUSE TO APPOINT A TRUSTEE

Under section 1104(a)(1), the questioned misfeasance or malfeasance must involve (a) the affairs of the debtor (b) by current management and (c) can have occurred before or after the bankruptcy case was filed.  While the movants have certainly illustrated at best a sloppiness, and, at least a cavalier attitude, in the manner in which Mr. Scutieri has operated the affairs of the Debtors, I find that none of the conduct, even when viewed collectively, rises to such a level as to require the appointment of a trustee.

### Failure to Observe Corporate Formalities

The movants argue appointment of a trustee is warranted by Mr. Scutieri's utter and complete failure pre-petition to observe corporate formalities, such as moving money in and out

of his various entities, including the Debtors, without anything more formal than an annual true up by Mr. Scutieri's accountant of many years, Earl Wald. This blurring of corporate lines also includes the use by KHS of the KRH, Ltd. liquor license after operation of the Hotel was transferred to KHS.

There is no question that, pre-petition, Mr. Scutieri operated his various corporations and partnerships more like separate bank accounts than separate legal entities. Money flowed to, from and through whatever entity seemed to have money available, and money was paid in and paid out, always, it seems, without the formalities of promissory notes, accountings, or anything more than Mr. Wald's annual attempt to book these transactions to reflect what actually occurred. Undoubtedly, a better accounting system would make it easier to determine the financial conditions of the Debtors, however it would not ultimately change the Debtors' financial realities. While it appears that there may have been a net outflow of cash from KHS to an insider during the year prior to bankruptcy, there is no question that over the years, and even during this case, money has flowed primarily in the direction of the Sundale Property and the Hotel. The Debtors provided the testimony of Mr. Wald that purported to show the net investment of Mr. Scutieri in Sundale and Kendall Hotel & Suites. Although Mr. Wald acknowledged that his final figure, approximately $19 million [Trans. 1161:2-5], is not entirely accurate, Mr. Wald testified that his review of the books and records of all the various Scutieri entities supports his testimony that Mr. Scutieri has certainly put more money into KHS and Sundale than he has ever taken out. [Trans. 1227:2-22]. Additionally, during the pendency of the bankruptcy case, Mr. Scutieri has made additional cash contributions to cover the shortfalls of the Debtors. *See, e.g.*, Debtor's Emergency Motion to Obtain Credit and Incur Debt (DE #677).

This failure to observe formalities continued, to a certain degree, post-petition – the renewal of the KRH, Ltd. liquor license by KHS; the failure of KHS to pay rent until ordered to do so by me; and Mr. Scutieri's influx of cash into the Hotel without prior notice or court authority.[8]

Mr. Scutieri as Trustee and Sundale also executed a joint agreement to engage the services of a real estate consultant, Jay Massirman, which agreement I did not approve. I directed that Sundale and Mr. Scutieri would need to engage Mr. Massirman's services separately with respect to the Sundale Property and Trustee Property and clarify better how and to what extent the two parcels would be marketed together. The Joint Plan proposes to market and sell these two properties together, with the proceeds of the Trustee Parcel used to pay creditors, if necessary.

In sum, there was no evidence that the manner in which Mr. Scutieri operated his entities' cash pre-petition defrauded any creditors. At most , there was a suggestion that there was an extremely remote possibility that some of the accounting choices Mr. Wald had made might cause some tax consequences that could, perhaps, impact the Debtors. The brokering of the two parcels together, even in the absence of the Joint Plan created a potential conflict, not an actual conflict. Accordingly, the movants have not demonstrated why a trustee is mandated based on these concerns.

**Failure To Pay Taxes**

The movants argue that a trustee also should be appointed because Sundale has not paid real estate taxes for 2006 and 2007, nor has Sundale paid personal property taxes either on the KHS rental income or on any personal property, and one month during the case KHS did not pay its payroll taxes. Failure to pay taxes can constitute cause to appoint a trustee. *In re Euro-Am.*

---

[8] Other than a feeble attempt at *nunc pro tunc* approval of the shareholder loan, which motion was later withdrawn.

*Lodging Corp.*, 365 B.R. 421. While I find the Debtor's flippant response less than persuasive,[9] nonetheless I hold that the nonpayment of taxes in these cases does not constitute cause to appoint a trustee.

Sundale has offered no explanation why real estate taxes have not been paid in two years, although it is not surprising that an entity with cash flow problems might choose to stop paying some bills, including taxes. However, there is no dispute that the tax collector is well protected, and based on even the low value of the Sundale Property[10] advocated by movants, there is plenty of value to pay those taxes in full with interest. The Joint Plan proposes to pay these taxes over time, or upon sale or refinancing of the Sundale Property.

As for the personal property issue, while it is undisputed that Sundale has never paid personal property taxes or filed a personal property tax return, Mr. Wald testified he was not sure whether the personal property taxes had been paid by another Scutieri entity. I accept the Debtors' explanation that there was a dispute regarding the amount of the taxes, which dispute is being resolved. The failure to pay tax on the rental receipts was clearly an error, which Mr. Scutieri readily admits, but which omission will be corrected if the Joint Plan is confirmed.

Jason Major, comptroller of KHS, testified that he made the decision to delay paying payroll taxes for one quarter because of a cash flow issue. Mr. Major claims he never consulted Mr. Scutieri about this decision. The taxes were ultimately paid and there was no evidence presented that fines or penalties were assessed. Accordingly I find the Debtors' failure to pay taxes does not support appointment of a trustee in this case.

---

[9] The Debtors argue that since lots of debtors do not pay taxes, failure to pay taxes is not a big deal: "If the Court were to consider the non-payment of taxes as 'cause' under 11 U.S.C. §1104, then the majority of Chapter 11 debtors would be staring down the barrel of a Chapter 11 trustee in every case." (Debtor's closing argument, p. 4). Moreover, the Debtors argue they have provided for payment of all taxes in the Joint Plan.

[10] The Debtors and the movants each submitted appraisals. Since, for purposes of the trustee trial, both sides acknowledged there was equity in the property and agreed there would be no valuation testimony, the issue of how much equity is not relevant for this order.

**The Liquor License Issue**

As noted previously, after the June hearing I determined the circumstances surrounding renewal of the liquor license did not warrant appointment of a trustee. There is no question the Debtors handled the situation poorly and whatever occurred happened because there was no true appreciation, it appears, of the need for corporate separation of previously related entities – one now controlled by a bankruptcy trustee. Nonetheless, while improvident, I find reasonable Mr. Scutieri's explanation that, in reviewing the license in KRH's name, in addition to preserving the liquor license for KHS, he also did not want to allow the lapse of an asset of the KRH bankruptcy estate. Thus, I find appointment of a trustee on those grounds alone inappropriate.

The movants also argued that what the Debtors did after I prohibited the sale of liquor at the Hotel constitutes additional grounds for appointment. Much was made by the movants regarding the fluctuation of the minibar and other liquor inventory reflected in the KHS debtor-in-possession reports. However, Mr. Bill James, the hotel manager, provided a plausible explanation regarding the fluctuating inventory levels reflected in KHS' monthly operating reports.  Mr. Terminello's testimony, as summarized by Debtors in their closing argument, further supports the Debtors' contention that no liquor was being sold at the Hotel.

> Mr. Terminello testified that when he visited the Hotel after the entry of the injunction, he randomly surveyed rooms at the Hotel to check the room mini-bars. [Trans. 1416:11-25]. The result of his survey was that no liquor was found in the mini-bars. [Trans. 1416:11-25]. He further testified that the Hotel was not selling liquor in violation of any law or the injunction. [Trans. 1413:1-13].

Debtor's Closing Argument, pg. 6-7.

On rebuttal, the movants presented the testimony of Manny Sires, a private investigator hired by FACE for the purpose of finding out whether liquor was being sold at the Hotel. As

summarized by the Debtors in their closing argument, Mr. Sires testimony was questionable and

problematic.

> On the night of October 27, 2008, Mr. Sires went to the Hotel and ordered
> food, two vodka tonics, and a Bud Light. Mr. Sires was not charged for the
> alcohol. Upon reporting to FACE that the Hotel did not charge him for the
> alcohol, FACE instructed Mr. Sires to return to the Hotel to try again. This
> time, as alleged by Mr. Sires, he ordered two vodka tonics and was allegedly
> charged for one soda. The same bartender charged him the second night for
> one "soda" but did not charge him the first night. On cross examination, Mr.
> Sires testimony began to unravel. Mr. Sires could not explain why he was
> charged for only one "soda" when he had ordered two vodka tonics.

Debtors' Closing Argument, pg. 8.

Mr. Sires' questionable testimony could not overcome the testimony of Mr. Terminello

and Mr. James even by a preponderance of the evidence, and thus I find the movants failed to

establish that KHS has been selling alcohol illegally.[11]

## The Bankruptcy Schedules

Of some concern is the repeated failure of KHS to file accurate schedules with respect to

transfers to insiders. Both on the original schedules and on the amended schedules, KHS failed to

note accurately payments and transfers to various Scutieri-owned entities and failed to identify

withdrawals or distributions given to an insider on the Statement of Financial Affairs ("SOFA").

Specifically, question 3C of the SOFA asks the debtor to "[l]ist all payments made within one

year immediately preceding the commencement of this case to or for the benefit of creditors who

are or were insiders." To this question, KHS marked "None." [Movant's Ex. 90, pg. 47 (DE

#134)]. Likewise, to question 10, which asks for a "[l]ist [of] all other property, other than

---

[11] The movants also claim that KHS was purchasing liquor illegally because KHS was purchasing liquor from a wholesaler while KHS was not licensed. First, as noted by KHS, the law prohibits a liquor wholesaler from selling alcohol to an unlicensed vendor. The movants did not cite to any law prohibiting the unlicensed vendor from purchasing alcohol from a wholesaler. Second, Mr. James testified he was unaware KHS was not supposed to purchase the alcohol while unlicensed and that, as soon as he learned he was not to do so, he directed that the alcohol be purchased from Costco and B.J.'s instead. While the movants made much of payments to liquor wholesalers after Mr. James said KHS stopped purchasing liquor from them, Mr. James adequately explained that the payments had probably been for outstanding invoices, or for mixers and other non-alcoholic supplies.

property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case," and question 23, which requests a list of "[w]ithdrawals from a partnership or distribution by a corporation," to both questions KHS answered "none." [Movant's Ex. 90, pg. 49,53 (DE #134)]. Debtor's accountant, Earl Wald, testified that the answers to these questions were incorrect and were merely "oversights." [Trans. 1189:18-1192:1]. However, even in the amended schedules filed as late as October 24, 2008, KHS had failed to completely and accurately answer these questions. [Trans. 1192:2-1195:3; Movant's Ex. 91 (DE #729)]. The omissions were again explained away as oversights. [Trans. 1194:25-1195:3].

Based on the testimony, these problems appear to be a function of attorney error and miscommunication rather than deliberate omission. The transfers were certainly not hidden in the documents turned over in discovery.  Thus, while unfortunate and, in context, troubling, the movants have failed to establish these omissions were deliberate attempts by Mr. Scutieri or others in Debtors' management to conceal the transfers.

**The Fire Sprinkler Issue**

There is no question that the lack of fire sprinklers in the hotel rooms has created significant problems between KHS and Holiday Hospitality.  There is also no issue that hotel rooms are safer with sprinklers than without. However, there is also no issue that the movants provided no evidence whatsoever that the lack of sprinklers in the rooms created an imminent danger to life.  Indeed, the Fire Department representative testified that, had there been such a danger, the Hotel would have been shut down immediately. I find that KHS could have handled

its issues with the Fire Department in a more timely manner,[12] but I also find that the movants have failed to prove that KHS has put the safety and welfare of its guests at risk because of the lack of sprinkled rooms,[13] or has acted in such a way with respect to the fire marshal issues or fire safety at the Hotel that appointment of a trustee would be warranted.

## Taking Money Out of the Hotel

There is no question that the Debtors' finances could have been better managed pre-petition. But other than failing to establish exactly how much of Mr. Scutieri's personal funds have been used to get the Hotel built and keep the Hotel running, the movants have failed to demonstrate that the flow of money in and out of the Debtors was designed to, or in fact did, cheat or defraud creditors.  While the evidence does show that, when the money merry-go-round stopped, KHS may have a potential recoverable transfer of nearly $587,000 from Sunrise Management, Philip Associates Builders, or Kendall Resort Hotel, Inc., all of which are Scutieri entities (The movants Ex. 120), I find the Debtors' decision not to pursue this potential recovery at this time is not troublesome. The Debtors' position from the first day of these cases has been that all creditors will be paid in full.[14] Assuming either the Debtors or any trustee successfully defeats the claim of the Codina Parties and the KRH Trustee, this is not an unlikely scenario.

---

[12] KHS did provide evidence that KHS was going through the proper administrative process to contest the fire marshal's ruling.

[13] FACE argued that the lack of sprinklers in rooms occupied by government employees was an imminent safety issue because the Hotel is on the "Approved Vendor List," and government-approved hotels must have sprinklers in all hotel rooms. Thus, the  movants argue, a government employee's expectation of a sprinkled room in the event of a fire could create an imminent life safety issue. This argument is not only unsupported by any evidence - there was no proof that government employees know about this regulation or take this fact into account when booking a hotel (indeed at least one government employee had no idea that room sprinklers are a requirement for government approved hotels), or that a government employee would act any differently when confronted with a hotel fire whether or not the room was sprinkled, but is also irrelevant to the issue with which I expressed my initial concern – "are people going to die." However, I did consider this testimony, as well as the other testimony presented in June, when making my final determination that the appointment of a trustee is not warranted by the evidence overall.

[14] At the disclosure hearing, Debtors suggested for the first time that there are scenarios in which a 100% distribution may not occur and the Joint Plan (with appropriate disclosures) will be modified accordingly. Thus, the issue of whether the Debtors have appropriately dealt with this possible asset will be addressed at the confirmation hearing.

Consequently, since the movants have failed to demonstrate the pre-petition transfers were fraudulent, and since the Debtors' decision not to pursue the potential preference yet is not an inappropriate judgment call, I do not find cause to appoint a trustee on these grounds.

## Gross Mismanagement

There are also some concerns whether the Hotel could have been better managed pre- and post-petition based on its financial performance. While it appears the Hotel had started to stabilize as a Radisson, the unflagging and reflagging destabilized the Hotel, requiring a "do over." Moreover, while the Hotel may still be going through ramp up, and while there may be some issues regarding the Crowne Plaza reservation system, there is no question the Hotel has not performed at the same level as comparable hotels in the general area. The Hotel is certainly not operating at a profit.

Nonetheless, the movants have failed to prove that the Hotel's current performance or performance over the last year is the result of gross mismanagement. "Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization. … But it must rise above simple mismanagement to achieve the level envisioned by the Code." *In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988) (citations omitted). Another court noted "[t]he factors used to determine gross mismanagement vary depending on the facts of the case, but often include elements that hint at fraud, in addition to negligence." *In re Microwave Prod. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989). Poor management alone does not warrant appointment of a trustee. *See In re St. Louis Globe-Democrat, Inc.*, 63 B.R. 131 (Bankr. E.D. Mo. 1985); *In re La Sherene, Inc.*, 3 B.R. 169 (Bankr. N.D. Ga. 1980). "After all, it is reasonable to assume that the majority of businesses that arrive in chapter 11 have exercised a certain degree of incompetence or mismanagement." *In re St. Louis*

*Globe-Democrat, Inc.*, 63 B.R. at 138. *See also*, *Schuster v. Dragone*, 266 B.R. 268 (D. Conn. 2001); *In re 4 C Solutions, Inc.*, 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003); *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 983-984 (Bankr. E.D. Pa. 1988).

In the instant case the uncontroverted testimony is that, notwithstanding the dispute with Holiday Hospitality, the Hotel is being well-run in terms of customer satisfaction. While there is no question the Hotel is not doing as well as comparable hotels, there remain questions regarding whether the Hotel is still in ramp up under the Crowne flag, whether the abysmal economy is affecting the Hotel performance, or whether the Hotel could be managed better or much better. Indeed, the movants' own expert, while speculating that he could not blame the discrepancy in the Hotel's performance compared to other hotels in the area on anything other than mismanagement, later conceded there were many factors he did not review that might have a bearing on the Hotel's performance and, indeed, he did not have enough data to render an opinion on whether the performance was caused by gross management.[15] [Trans., 635:1-16].

Nor is the dispute with Holiday Hospitality evidence in itself of gross mismanagement. Even if KHS' position regarding the bias against the Hotel of the Crowne reservation system is not well-founded, the dispute regarding the PIP has been conducted in good faith, according to Holiday Hospitality's own representative [The movants Ex. 34, Deposition of Charles Broun, III, 70:25-71:8], and, if the PIP issue were resolved, the Hotel would "meet the brand standards." [The movants Ex. 34, 86:21-22].

---

[15] The Debtors challenged Mr. Argiz's qualifications to testify as an expert on the matters for which a great deal of his testimony was presented. I determined I would allow the testimony and determine after hearing the testimony whether it should be excluded. Since I did not rely on any of Mr. Argiz' testimony I need not make such a determination, but, had I ruled I would probably have excluded a great deal of Mr. Argiz' testimony. I did not require Mr. Argiz' testimony to confirm what the undisputed evidence showed – that the Hotel had historically had done better when it was flagged than when it was unflagged. Mr. Argiz also conceded he was not able to render opinions in two of the other primary areas for which his testimony was solicited - gross mismanagement and criteria impacting performance of hotels when flagged versus when hotels are unflagged.

Finally, the movants argue that the Debtors' failure to predict that KHS would need cash in the summer is evidence of gross mismanagement.  As noted above, the Debtors knew KHS would run short of cash in the summer, which was why, they argued, KHS shouldn't have to pay rent.  Mr. Scutieri's failure to get timely court approval for what he hoped would be a shareholder loan, due to KHS' immediate need for cash, harmed no creditor.  Indeed, Mr. Scutieri's untimely, and later withdrawn, request, resulted in a "gift" to the KHS, and therefore, Sundale, estates.

Thus, the movants have failed to show by clear convincing evidence, or even a preponderance of the evidence, that the Debtors are grossly mismanaging the affairs of either Debtor.

While the movants have raised some legitimate concerns regarding the manner in which Mr. Scutieri and his employees have managed the Hotel and the Sundale and KHS estates, and while Mr. Scutieri and his team could have made better decisions on certain issues, even when considered collectively, the movants have failed to demonstrate fraud, gross mismanagement, or dishonesty. There is no question Mr. Scutieri could have done a better job operating the Hotel and managing these bankruptcy cases, but the Hotel is receiving high ratings, the guests are not subject to life threatening deficiencies, and Mr. Scutieri continues to make up operating shortfalls. Consequently, the current circumstances do not warrant appointment of a trustee for cause pursuant to section 1104(a)(1).

### THE APPOINTMENT OF A TRUSTEE AT THIS JUNCTURE WOULD NOT BE IN THE BEST INTERESTS OF CREDITORS, EQUITY HOLDERS, OR OTHER PARTIES IN INTEREST

The movants have also failed to show that appointment of a trustee would be "in the interests of creditors, any equity security holders, and other interests of the estate." As noted

above, there are a variety of factors a court may consider in determining whether the totality of circumstances warrants appointment of a trustee under section 1104(a)(2). The movants argue the same facts that constitute cause under section 1104(a)(1) support appointment of a trustee under section 1104(a)(2). The Debtors argue that Mr. Scutieri's continued financial support of the Debtors, the substantial equity in the Sundale Property, as well as the movants' true motives, weigh in the Debtors' favor against appointment.

One primary ground for appointment of a trustee cited by the movants is their lack of confidence in Mr. Scutieri and his management team. Loss of creditor confidence can arise from a variety of missteps by a debtor, a debtor's inability to come up with a plan, or concern regarding a debtor's ability to reorganize because of conflict between the debtor and creditors. As discussed above, while there have been missteps, the case is moving forward, the Debtors have filed the Joint Plan and their ability to reorganize will be tested through the confirmation process.

Loss of confidence, or extreme acrimony, have each been held by courts to constitute elements relevant to the decision of whether it is in the best interests of creditors and others under section 1104(a)(2) to appoint a trustee. *In re Marvel Entm't Group*, 140 F.3d 463 (3d Cir. 1998). *See also*, *In re G-I Holdings, Inc.*, 385 F.3d at 316. Indeed, in certain extreme cases, the presence of rancor and acrimony has been found to be significant enough to constitute cause to appoint a trustee under section 1104(a)(1). *Id*.

Neither loss of confidence, however reasonable, or acrimony, however bitter, necessarily results in appointment of a trustee. "[T]here is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee." *In re Marvel Entm't Group*, 140 F.3d at 473. Or, as the *Marvel* court also noted

24

> a district court may find cause to appoint a trustee for "acrimony" only on a case-by-case basis, when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor or, as is found in [*Cajun Electric*[16]], when the parties "begin working at cross-purposes".

140 F.3d at 472-473.

The mere existence of concerns or conflicts are not necessarily enough. Thus, for example, *In re G-I Holdings, Inc.*, the Third Circuit noted in dicta[17] that while "[t]here is unquestionably considerable acrimony between the debtor and the asbestos claimants … some of the most contentious disputes will presumably be addressed in other pending litigation." 385 F.3d at 321. The court further noted that it did not appear the bankruptcy court had abused its discretion in determining that, notwithstanding such acrimony "the debtor in possession would be able to discharge its fiduciary obligations with regard to other matters." *Id.* Conversely in *Marvel*, the Third Circuit held that the extreme acrimony between the controlling shareholder group that took over the debtor management in an adversarial manner post-petition and creditors of the debtor who had opposed the takeover warranted appointment of a trustee because

> [t]he intense and high stakes bickering between the Icahn interests[, the takeover group,] and the lenders does not instill confidence that the Icahn interests would fairly negotiate with the creditors to whom they owe these duties, nor that reorganization will occur effectively.

140 F.3d at 474.

Loss of confidence need not arise from, or cause, acrimony.  A court may find appointment of a trustee is warranted when a debtor's failure to move a case forward in the direction of a successful reorganization has caused the creditors to lose confidence that reorganization is, in fact, possible with current management at the helm. *See, e.g., In re Cardinal Indus.*, 109 B.R. at 765 (the creditors ultimately lost confidence in the debtors' ability to direct

---

[16] *Cajun Elec. Power Coop. v. Central La. Elec. Coop. (In re Cajun Elec. Power Coop, Inc.)*, 74 F.3d 599 (5th Cir. 1996) (adopting on rehearing the dissent's opinion in 69 F.3d at 751) *cert. denied*, 117 S. Ct. 51 (1996).
[17] The issue before the Third Circuit was the burden of proof standard.

their own reorganization due not to "one specific problem, but came about because of many events which, when seen in combination, make it appear that the debtors are not properly in control of their reorganizations"); *In re Concord Coal Corp.*, 11 B.R. 552 (Bankr. S.D. W.Va. 1981) (the debtor's principal's several competing business interests, as well as questionable inter-company transfers, made it unlikely debtor would garner the creditor confidence needed to successfully reorganize). However, a creditor's lack of confidence must be based on some objective fact before a court should consider lack of confidence as a factor in considering appointment of a trustee. Thus, for example, if a creditor argued appointment of a trustee was warranted merely because of the creditor's personal dislike of management, then perhaps the creditor would be better served by hiring someone else to negotiate on the creditor's behalf. Management should not be replaced just because it is not liked.

In this case there is a tremendous amount of rancor and acrimony between FACE and Chambers and Mr. Scutieri, as well as acrimony between Scutieri and the Codina Parties. Indeed the acrimony between the FACE/Chambers group and Mr. Scutieri has unquestionably contributed to a level of litigation from both sides that has taken up court time and resources, including the never-ending discovery squabbles.[18] FACE's articulated lack of confidence is based on FACE's belief that its claim dispute would be better resolved by a neutral party, and concerns that, with Mr. Scutieri's track record, he will never be able to get funding. Ocean Bank, in its joinder, argued its lack of confidence arose due to the Debtors' failure to advise Ocean Bank that KRH, Ltd., a co-maker of the Ocean Bank loan, had stopped operating the Hotel and had filed bankruptcy, and that there was a new Hotel operator. At trial, Justin Reay, the Ocean Bank special assets officer overseeing the Sundale loan, testified the Bank's continued

---

[18] Mr. Scutieri has also engaged in some tactics in his personal dispute with Mr. Chambers that are certainly troubling, but were only of relevance to the trustee motion because KHS was marginally involved in mailing certain inflammatory pamphlets to Mr. Chambers and his counsel.

lack of confidence is due to the rent issue, the liquor license issue, and the failure to pay real property taxes for two years.  The Codina Parties put on no evidence regarding the Codina Parties' lack of confidence.

Despite the movants' assertions, the testimony at trial undercuts the creditors' arguments that they lack confidence such that appointment of a trustee is warranted. Inglis, the principal of FACE, testified that while he believed Mr. Scutieri's reputation for litigation would make it difficult, if not impossible, for Mr. Scutieri to get financing for the property, Inglis also conceded that he could not say Mr. Scutieri's failure to timely get refinancing prior to getting the Ocean Bank loan was irresponsible. [Trans., 112:8-13].  Moreover, during this time, that is, prior to the Ocean Bank financing, FACE increased its original funding commitment to Sundale from $2 million to $6.5 million. Finally, although Sundale apparently stopped making debt service two and half years prior to the Sundale bankruptcy, FACE did not pursue any of its remedies until the bankruptcy. In other words, FACE was willing to extend more credit and leave Mr. Scutieri in control of the Sundale Property for quite some time, notwithstanding FACE's purported lack of confidence and the troubled relationship.

While, as noted above, Ocean Bank claimed that it lost confidence in the Debtors when it discovered that KRH was no longer operating the Hotel and was in bankruptcy, this position was countered by testimony from Mr. Reay who stated that he did not put the loan into default upon learning about KRH and its bankruptcy, until Mr. Scutieri failed to follow-up to discuss a loan extension after first cancelling a meeting due to illness. Moreover, Mr. Reay testified that what Ocean Bank really wants is to get paid as soon as possible.  Quick payment is not a surprising creditor goal – indeed, FACE also expressed the desire for "timely" payment – but a delay in payment in a bankruptcy case, no matter how disappointing to a creditor, does not, in and of

itself warrant appointment of a trustee due to lack of creditor confidence. The appropriateness of any proposed delay can be tested through the upcoming confirmation process, measured against the requirements of 11 U.S.C. §1129.

While there is no question that there are serious disputes between FACE and the Debtors, Chambers and Mr. Scutieri, and the Codina Parties, the Debtors, and Mr. Scutieri, those disputes are being resolved in pending proceedings.[19] Thus, as noted by the *G-I Holdings* court, these conflicts, however bitter, are already being litigated in an appropriate forum, and will get resolved.

The Debtors argue that a trustee should not be appointed because the movants have ill motives in seeking appointment of a trustee. As I have previously ruled in this case, if the movants have legitimate grounds to seek the relief in the Trustee Motion it is irrelevant that the movants have "ill" motives that spur them to seek the relief to which they are otherwise legitimately entitled.

The movants have also expressed their lack of confidence in the Debtors' ability to reorganize because the Debtors did not file a plan until almost a year after the bankruptcy was filed, and the Debtors have acted in a way that focuses more on Mr. Scutieri's self-interest in maximizing a return to equity than on the interest of the creditors to whom he, on behalf of the Debtors, owes a fiduciary duty. Although the Debtors have claimed that litigation with FACE and Codina prevented Mr. Scutieri from getting started on reorganization efforts early in the case, Mr. Scutieri does appear to have started the process in earnest in August and, as already noted, a plan of reorganization is on file and on track for disclosure and confirmation. Moreover,

---

[19] The Debtors have also stated that they will soon be filing some sort of proceeding or claim objection to dispute Ocean Bank's default interest charges.

a debtor-in-possession can be motivated by self interest so long as the debtor-in-possession meets its fiduciary obligations to its creditors.

In viewing the totality of the circumstances and the current posture of the case, notwithstanding the legitimate concerns about the manner in which the Debtors and their principal have conducted themselves, and taking into account all relevant factors in determining what is in the best interests of all parties, I find appointment of trustee under section 1104(a)(2) is not appropriate at this time.  The Joint Plan is filed, and will or will not be confirmed in the next three months.  Introducing a trustee to the process prior to testing the confirmability of the Joint Plan does not make economic sense.[20]  The Debtors will have the opportunity to prove feasibility during the confirmation process.  If the Debtors meet their burden to prove all elements for confirmation of the Joint Plan, they have every right to move forward in accordance with that plan.   Moreover, Mr. Scutieri has the right, within certain parameters, to protect his own interests as well as those of the creditors.  Thus, I am willing to give Mr. Scutieri the opportunity to prove he can meet his personal goals while protecting the rights and interests of creditors consistent with section 1129 of the Code, pursuant to the Joint Plan he has caused the Debtors to file.[21] However, Mr. Scutieri and his team will only get this one chance.

Because of the concerns raised by the movants and my own concerns, if the Debtors are unable to meet their burden under section 1129, then the facts warrant appointment of a trustee at that time. The Debtors have been sloppy or cavalier in many of their obligations – the Debtors have paid administrative expenses, such as rent and franchise fees, only when ordered to; the Debtors needed several tries to get their schedules right; the Debtors only took steps to fully resolve their issues with the fire marshal when faced with litigation; and the Debtors continued to

---

[20] It would make no sense to appoint an examiner at this juncture of the cases either.
[21] Based on discussions at the Disclosure Statement hearing it appears an Amended Plan will be filed shortly.

use professionals without seeking court approval pursuant to 11 U.S.C. §330. Mr. Scutieri's judgment regarding the treatment of FACE obligation, no matter how real his beliefs, may be clouded by his personal dispute with Mr. Chambers.[22]  Furthermore, KHS, the money source for Sundale, is not profitable. It survives, and therefore Sundale survives, only when and to the extent Mr. Scutieri makes up the shortfalls.  The viability of that business plan will be tested at confirmation.

Moreover, the creditors should not be made to wait indefinitely while Mr. Scutieri tries to maximize his share of value in the Debtors' assets. As a single asset real estate debtor,[23] Sundale had a limited time to propose a plan or start paying its secured lenders. While I extended these deadlines for cause, as articulated in my prior rulings, there is no question that Sundale has now had a year to put together a game plan, instead of the statutory 90 days. If the Debtors cannot demonstrate that their best shot will work, then it is time to turn the case over to a neutral third party – a trustee – to make a go of maximizing value for all constituencies including equity.

In sum the totality of the circumstances currently tip the balance slightly in favor the Debtors and against appointment of a trustee.  But if the Debtors are unable to confirm the Joint Plan, then the scales tip the other way, and appointment of a trustee will be "in the interests of creditors, any equity security holders, and other interests of the estate …."

<u>**CONCLUSION**</u>

The extent of the litigation in this case has been significant, and I can only imagine the costs are staggering. While the Debtors have brought a great deal of this on themselves due to the careless, and sometimes flippant, manner in which they have handled certain aspects of these bankruptcy cases, the  movants have also almost drowned out their legitimate concerns in a flood

---

[22] Mr. Scutieri's protests that the has no personal animosity towards Mr. Chambers are unbelievable, but also irrelevant to my ruling.
[23] I will not rehash here my ruling on that issue.

of excessive, and sometimes irrelevant or superfluous, information. As this case approaches

confirmation, I hope the Debtors will act more carefully and conscientiously, and I hope the

movants will be more politic in the battles they fight and the weapons they seek to use. The

ultimate goal for all parties should be reorganization – or at least a realization of fair value for

the benefit of all concerned. Hopefully, the next few weeks will reflect the parties' focus on that

goal.


###

Copies furnished to:
Peter Russin, Esq.

*Attorney Russin shall serve a conformed copy of this order upon all parties in interest
and shall file a Certificate of Service of same with the Clerk of the Court.*